■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ERNEST DAVIS, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered December 5, 1978, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence. Judgment reversed, as a matter of discretion in the interest of justice, and new trial ordered. The defendant was a uniformed court officer in Supreme Court, Kings County, who was also employed by the New York City Transit Authority as a bus driver. At approximately 1:45 A.M., on March 21, 1978, the defendant was driving his bus in the vicinity of Sumner Avenue and Broadway in Brooklyn. Contrary to an administrative regulation of the Transit Authority, he was carrying a weapon at the time. His possession of the weapon was lawful, however, because of his status as a peace officer. In any event, when he brought the bus to a halt near Sumner and Broadway, he became embroiled in an altercation with one Benny McKinney. The dispute escalated and then culminated in the fatal shooting of McKinney who died at the scene. The defendant was subsequently arrested, tried and convicted for murder in connection with McKinney's death. He now appeals. The circumstances surrounding and precipitating the shooting were vigorously contested at trial. The two passengers who had been present during the incident testified as prosecution witnesses. The account they gave was that McKinney was attempting to board the bus with them but was prevented from doing so by the defendant who refused to allow him to board, apparently because he did not have the fare. McKinney borrowed a quarter from one of the witnesses and the other finally offered to pay his fare. Nevertheless, the defendant persisted in his refusal to permit McKinney on the bus saying, according to one of the witnesses, that McKinney was "a problem". Meanwhile, McKinney continued to plead with the defendant to allow him to board the bus so that he could go home. When McKinney managed to step up onto the bus, a struggle began and the defendant pulled him off the vehicle and onto the sidewalk. McKinney fell to the ground and then got up. He had nothing in his hands but the quarter he had borrowed. According to one of the witnesses, McKinney raised his hands with palms turned upward and said to the defendant, "Don't do me like this. Let me go." A gunshot was then heard and McKinney fell to the ground. The defendant returned to the bus, holstered his weapon, and began driving at high speed. When police sirens sounded, the defendant stopped the bus and officers boarded. The defendant, testifying in his own behalf, gave a materially different account of the incident. He testified that Broadway and Sumner Avenue was a terminal stop at which he would remain between trips. He claimed that his confrontation with McKinney had started there before the prosecution witnesses arrived. According to the defendant, as he sat alone in his bus prior to beginning his return run, McKinney approached his window and demanded to be let onto the bus. The defendant refused, explaining that he was not permitted to open the door at that location. He directed McKinney to the bus stop ahead and said that he would pull the bus up there shortly. At this, McKinney began to kick at the door and curse. He tried to board through the rear door and, when he was unsuccessful, he resumed his cursing and threatening behavior. When the defendant warned McKinney that the police would be called and that he might end up in jail, McKinney boasted that he had been in jail before, that he was not afraid of the police, and that he had "busted more polices' *[sic]* heads then *[sic]* you can shake a stick at". He threatened to kick the door in

and the defendant's face with it. According to the defendant, McKinney appeared to be "high" and was looking around as he spoke. The defendant thereupon pulled the bus up to the stop where the two prosecution witnesses were waiting. He intended to pick them up and pull away quickly before McKinney had an opportunity to reach them. The first witness entered and took a seat but the second remained on the step blocking the door and protested that the defendant had no right to decide who could or could not ride the bus. In the meantime, McKinney arrived and began pushing his way past the protesting passenger. The defendant got out of his seat but McKinney managed to grab him and pull him out the door and onto the street. Once on the sidewalk, the defendant felt someone pulling on his belt from behind. He felt a man at his back and saw another to his right, while McKinney remained facing him. As the defendant reached for his weapon, he saw a gun directly in front of him. He used his own weapon to slap McKinney on the forehead but he immediately felt himself being pulled from behind. He then heard a shot, saw McKinney backing away, and was released from the grip of the man behind him. He turned and saw one of the men running toward the rear of the bus, and then saw McKinney fall near the front of the vehicle. The defendant re-entered the bus and began driving. He intended to locate a police car since his attempts to radio for assistance were unsuccessful. After having driven for about five blocks, he saw patrol cars coming toward him and he stopped the bus. The officers who boarded the bus immediately moved toward one of the passengers but the defendant explained that the passenger was not involved. The defendant then identified himself as a court officer and reported to the police that he had been assaulted by three men at the bus stop, that one of them had a gun, and that a shot had been fired. At the request of a police officer, the defendant surrendered his weapon. The officer who pursued, stopped and then boarded the bus testified that, when asked what had happened, the defendant replied that he had shot a man who had had a gun. According to the officer, the defendant then said, "There were three men at the bus stop, one had a gun, they tried to rob me." As suggested by the conflicting testimony, the central issue at trial was justification. The prosecution maintained that the defendant had intentionally killed McKinney who was simply trying to board the bus to go home. The defendant, on the other hand, insisted that he had been assaulted by three men and that, in the course of the struggle, his gun had gone off. Although, on the witness stand, the defendant never specifically claimed that he had been the intended victim of a robbery, that possibility was squarely presented by the evidence. As noted, the defendant told a police officer on the bus that there were three men at the bus stop, one of whom was armed, and that "they tried to rob me." Moreover, in the course of his direct examination, the following exchange occurred: "Q. When this man, at this point, is forcing his way onto this bus in the manner in which he is doing it, what's going through your mind? A. Well, I feel there is a robbery. I have seen many pocketbooks snatched. * * * Q. What's going on in your mind? A. Well, in my mind at this time I know that we all are in immediate danger. This man has attacked me. I don't know what his reasons are but I can only assume this is an attempted robbery." In summation, defense counsel repeatedly described the incident as a mugging or attempted robbery of a bus driver, and he referred to the defendant as the victim of that crime who had acted legitimately in self-defense against the perpetrator, McKinney. Indeed, the prosecutor himself focused on the issue when he said in summation: "So, ladies and gentlemen, basically, that bring [sic] us to the issue here and the

issue can be stated very simply. Was there a robbery or was there an attempted robbery? That is really what it comes to, because ladies and gentlemen, if there was a robbery and you believe that there was a robbery, by all means, acquit Ernest Davis because no man should be held responsible for defending himself in that kind of situation." In light of these circumstances, we are constrained to hold that the trial court's charge on justification was inadequate and warrants a new trial. Essentially, the court instructed the jury on those provisions of the Penal Law dealing with the justifiable use of deadly physical force (1) by a person responsible for the maintenance of order on a common carrier (Penal Law, § 35.10, subd 3); (2) by a person acting to repel the imminent use of deadly physical force against himself (Penal Law, § 35.15, subds 1, 2, par [a]) and (3) by a peace officer in the course of effecting an arrest (Penal Law, § 35.30). Although the charge on those provisions was not free of errors, most redounded to the defendant's benefit since the instructions were more favorable to him than were the provisions themselves. Nevertheless, there was no significant evidence to support the notion that the defendant had acted while effecting an arrest as a peace officer or while maintaining order on the bus. The evidence favorable to the defendant suggested alternatively that he had fired by accident, that he had fired when confronted with McKinney's gun, or that he had fired while defending himself against an attempted robbery, In accordance with the last theory, the court should have instructed the jury on the circumstances under which an individual is justified in using deadly physical force to resist an attempted robbery. Thus, the jury should have been told that the defendant was justified in resorting to deadly physical force if he reasonably believed it necessary to do so in order to resist McKinney's imminent use of physical force against him in the course of a robbery attempt (see Penal Law, § 35.15, subds 1, 2, par [b]). On this record, in view of the evidence and argument presented to the jury, we hold that the failure to so charge deprived the defendant of a fair trial. This is notwithstanding the fact that evidence adduced by the defense suggested alternative and inconsistent defenses (cf. *People v Steele,* 26 NY2d 526). Finally, we note that, although defense counsel took several exceptions and made a number of requests at the close of the court's charge, none referred specifically to justification as it relates to resistance to an attempted robbery. Counsel's broad request that the court charge "on other provisions on [sic] law pursuant to P.L. Article 35" lacked sufficient specificity to call the court's attention to the error which might well have been corrected had a proper objection been made (cf. CPL 470.05, subd 2). Hence, the court's failure to charge on the appropriate provision has not been preserved for our review as a question of law (cf. *People v Cona,* 49 NY2d 26). Nevertheless, in view of the fact that justification was the central issue in this case, we conclude that the court's failure to charge correctly on that defense warrants a new trial in the interest of justice (cf. *People v Lyles,* 63 AD2d 740). Mollen, P. J., Hopkins, Lazer and O'Connor, JJ., concur.